UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SUNDIAL PARTNERS, INC.,

      Plaintiff,

v.                                              Case No: 8:15-cv-861-T-23JSS

ATLANTIC STREET CAPITAL
MANAGEMENT LLC,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on Defendant's Motion to Compel Arbitration, Alternative Motion to Dismiss ("Motion"). (Dkt. 17.) The Court held an evidentiary hearing on Defendant's Motion on November 17, 2015. For the reasons that follow, the Court recommends that Defendant's Motion be granted.

Plaintiff, Sundial Partners, Inc., filed this action on April 10, 2015, against Defendant, Atlantic Street Capital Management LLC, for breach of an alleged oral contract or, in the alternative, unjust enrichment. (Dkt. 1.) Specifically, Plaintiff alleges that Defendant breached an oral agreement under which Defendant agreed to pay Plaintiff a fee if Defendant acquired a company identified and introduced by Plaintiff.

On July 9, 2015, Defendant filed its Motion to Compel Arbitration, Alternative Motion to Dismiss, seeking to compel arbitration or to dismiss Plaintiff's unjust enrichment claim. (Dkt. 17.) On August 31, 2015, District Judge Steven D. Merryday referred Defendant's Motion to the undersigned for an evidentiary hearing and report and recommendation, finding that "facts material to the arbitrability of this action are in dispute." (Dkt. 43.) The undersigned held an evidentiary hearing on Defendant's Motion on November 17, 2015. (Dkt. 49, 54.)

## FACTUAL BACKGROUND

Plaintiff, Sundial Partners, Inc., is a Florida-based and licensed real estate brokerage firm and business intermediary that identifies and introduces small and mid-sized companies to potential buyers or investors and collects a fee for facilitating a transaction between the buyer and seller. Defendant, Atlantic Street Capital Management LLC, is a Connecticut-based private equity group that invests in middle-market companies.

In this case, Defendant owned a company called Z Wireless, an operator of Verizon Wireless premium retail stores, and sought to acquire an additional company ("add-on company") to complement and grow Z Wireless. On February 23, 2012, Plaintiff's general manager, Douglas Trottier, contacted Defendant's vice president, Stephanie Davies, to discuss a potential add-on company for Z Wireless. After the conversation, Mr. Trottier identified ABC Phones of North Carolina, Inc. (d/b/a "A Wireless," referred to herein as "ABC"), an exclusive premium retailer for Verizon Wireless, as a potential add-on company. In response, Ms. Davies sent Mr. Trottier a written agreement ("Finder Agreement") that set forth the terms of the transaction and included an arbitration provision. In the two years following their February 23, 2012, telephone conversation, the parties continued to communicate regarding the status of the transaction, but neither party signed the Finder Agreement. Ultimately, Defendant declined the proposed transaction. Sometime later, Defendant reinitiated contact with ABC and acquired the company in March 2015.

At the evidentiary hearing, Ms. Davies and Mr. Trottier testified, and Defendant introduced as evidence a series of e-mail exchanges between them that chronicle the transaction at issue. During the hearing, Ms. Davies and Mr. Trottier presented a consistent set of facts regarding the inception of the transaction. Specifically, the evidence showed that, upon learning of a potential add-on deal for Z Wireless, Mr. Trottier contacted Ms. Davies via e-mail on February 23, 2012, to

discuss the potential opportunity.  (Def.'s Ex. 1.)  Ms. Davies and Mr. Trottier both testified that

they had never spoken with each other before this e-mail.  The e-mail exchange stated:

> Mr. Trottier:  Hi Stephanie, I have a potential add on deal I would
> like to discuss with you. Let me know when we can
> schedule a call?
>
> Ms. Davies:  Doug, Would 4:00 pm work today?
>
> Mr. Trottier:  Yes call my cell # below.

Following the introductory e-mail, Mr. Trottier and Ms. Davies engaged in a telephone

conversation to discuss the opportunity further.  (Dkt. 18, Dkt. 34.)  Ms. Davies and Mr. Trottier

testified that the telephone conversation lasted about ten minutes.  During the conversation, Mr.

Trottier identified ABC as the potential add-on company and inquired as to the method of

compensation used by Defendant in its acquisitions, to which Ms. Davies confirmed that

Defendant used the Lehman formula.  Shortly after the telephone call, Mr. Trottier e-mailed Ms.

Davies, stating:

> It was a pleasure to speak with you this afternoon and thanks for
> confirming I can represent your group with a standard Lehman
> contingent buys side fee on this deal. I look fwd to getting the fee
> agreement and confidentiality agreement along with your company
> brochure. I will wait to hear back from you before I present anything
> to the sellers.

(Def.'s Ex. 2.)  In the same e-mail, Mr. Trottier identified ABC again and provided a short

description of the company.  (Def.'s Ex. 2.)  In response, Ms. Davies e-mailed Mr. Trottier, stating:

> It was a pleasure speaking with you today. Attached are the
> documents we discussed on the phone. (Per your question, it is a
> standard Lehman formula on our buy side agreement.)

(Def.'s Ex. 4.)  The attachments included the Finder Agreement, a Confidentiality Agreement, and

Atlantic's Company Profile.  (Def.'s Ex. 1.)  The Finder Agreement attached to the e-mail included

an arbitration provision stating the following: "Any controversy or claim arising out of or relating

to this Agreement shall be settled by arbitration in accordance with the Rules of the American Arbitration Association in effect at the time such arbitration is instituted." (Dkt. 17, Ex. A.)  The Finder Agreement also included a "tail" provision, which stated "BUYER shall pay FINDER all compensation described with respect to any transaction consummated with any party at any time prior to 24 months after the initial identification if such party is one identified to the Company by FINDER before or during the Authorization Period." (Dkt. 17, Ex. A.)  The Authorization Period under the Finder Agreement is defined as the period from the January 13, 2012,[1] Agreement Date through the date that either FINDER or BUYER terminates the Agreement in writing.  (Dkt. 17, Ex. A.)

Following the February 23, 2012, e-mail exchanges, Ms. Davies requested that Mr. Trottier arrange a conference call with the owner of ABC.  (Def.'s Ex. 1.)  The conference call took place on March 9, 2012.  A few minutes before the conference call began, Ms. Davies sent Mr. Trottier a revised and executed confidentiality agreement between Defendant and ABC, which governed the disclosure of confidential information between Defendant and ABC regarding the proposed transaction.  (Def.'s Ex. 1, Dkt. 34.)

On March 22, 2012, Ms. Davies e-mailed Mr. Trottier to inform him that the transaction would not likely occur, as the opportunity was too large for Defendant to undertake at the time.  (Def.'s Ex. 5.)  Subsequently, from August 2012 to January 2014, Mr. Trottier contacted Ms. Davies on several occasions via e-mail to follow up on the status of the potential acquisition of ABC.  (Dkt. 34.)  In response to each inquiry, Ms. Davies informed Mr. Trottier that Defendant was still unable to undertake the opportunity but would stay in contact to revisit the situation and

---

[1] The parties agree that the January 13, 2012, date is a mistake, with Plaintiff contending the document was a draft proposed agreement, and Defendant maintaining the date was merely a mistake related to Ms. Davies' handling a number of tasks simultaneously.

discuss other potential add-on companies that Mr. Trottier may identify.  Mr. Trottier testified that

neither party discussed the Finder Agreement or its terms during this time.  Ultimately, on January

28, 2014, Ms. Davies informed Mr. Trottier that the transaction with ABC would not take place.

Ms. Davies and Mr. Trottier spoke again by telephone on March 3, 2014, during which Ms. Davies

confirmed that the transaction between Defendant and ABC would not take place.  Sometime later,

Defendant reinitiated contact with ABC without Plaintiff's involvement.  A year later, in March

2015, Defendant acquired ABC.  (Dkt. 18.)

### APPLICABLE STANDARDS

The validity of an arbitration agreement is generally governed by the Federal Arbitration

Act ("FAA"), 9 U.S.C. § 1 *et seq.*  The FAA "embodies a liberal federal policy favoring arbitration

agreements" and was enacted "to relieve congestion in the courts and to provide parties with an

alternative method for dispute resolution that is speedier and less costly than litigation." *Caley v.*

*Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367 (11th Cir. 2005) (internal quotation and citation

omitted).  Arbitration proceedings are "summary in nature to effectuate the national policy of

favoring arbitration, and they require expeditious and summary hearing, with only restricted

inquiry into factual issues." *O.R. Sec., Inc. v. Prof'l Planning Assocs., Inc.*, 857 F.2d 742, 747–48

(11th Cir. 1988) (internal quotation omitted and citation omitted).

A district court must grant a motion to compel arbitration if it is satisfied that the parties

actually agreed to arbitrate the dispute. *John B. Goodman Ltd. P'ship v. THF Constr., Inc.*, 321

F.3d 1094, 1095 (11th Cir. 2003).  In determining the propriety of a motion to compel arbitration

under the FAA, courts must determine the following: (1) whether the parties agreed to arbitrate

the dispute; and (2) whether legal constraints external to the parties' agreement foreclosed the

arbitration of those claims. *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004) (citing

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626–28 (1985)).  Thus, the court must first determine whether a valid agreement to arbitrate exists.  *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 854 (11th Cir. 1992); *see also Jenkins v. First Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 881 (11th Cir. 2005) (stating that before determining whether arbitration should be compelled under the FAA, the district court can decide whether the parties assented to the contracts containing the arbitration clauses).

To determine whether an arbitration agreement exists, courts must apply state-law principles of contract law.  *Hanover Ins. Co. v. Atlantis Drywall & Framing LLC*, 611 F. App'x 585, 588 (11th Cir. 2015).  In diversity cases, the court must apply the substantive law of the forum state, including the forum's choice-of-law rules.  *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1515 (11th Cir. 1997) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  As this Court sits in Florida, it must apply Florida's choice-of-law rules.  Florida has traditionally applied the *lex loci contractus* doctrine for choice-of-law determinations regarding issues of contract law.  *Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1119 (11th Cir. 1996) (citing *Goodman v. Olsen*, 305 So. 2d 753, 755 (Fla. 1974)).  According to this doctrine, the law applied to questions regarding the validity and substantive obligations of a contract is the law of the state where the contract was made or was to be performed.  *LaFarge Corp.*, 118 F.3d at 1515; *Morgan Walton Props., Inc. v. Int'l City Bank & Tr. Co.*, 404 So. 2d 1059, 1061 (Fla. 1981) ("Florida's established rule for choice of law governing the validity and interpretation of contracts looks to the law of the place of contracting and the law of the place of performance.").  The determination of where a contract was executed requires fact-intensive inquiry and "a determination of where the last act necessary to complete the contract was done."

*Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1092–93 (11th Cir. 2004) (internal quotations and alterations omitted).

In this case, the Finder Agreement was sent from Defendant's Connecticut office to Plaintiff's Florida office, and the agreement contains a choice-of-law provision mandating the application of New York law in interpreting the agreement. Generally, Florida enforces choice-of-law provisions unless the law of the chosen forum contravenes strong public policy. *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000). However, the Court cannot apply an agreement's choice-of-law provision to determine, or before determining, whether a valid agreement exists at all. *See Williams v. Gen. Elec.*, 13 F. Supp. 3d 1176, 1181 n.5 (N.D. Ala. 2014) ("[A] court cannot sensibly apply a contractual choice-of-law provision before the court determines that the parties have a valid contract."). Therefore, the Court finds that Florida law should apply to the determination of whether an agreement to arbitrate exists, as Plaintiff's performance under the agreement was due in Florida and thus constituted the last act necessary to complete the contract. *See Prime Ins. Syndicate, Inc.*, 363 F.3d at 1092–93 ("The last act necessary to complete a contract is the offeree's communication of acceptance to the offeror."). Both parties apply Florida law in their respective memoranda on this issue. (Dkt. 17, Dkt. 33.)

## ANALYSIS

In this matter, the parties dispute whether they intended to be bound by the unexecuted Finder Agreement, which includes an arbitration provision requiring the parties to arbitrate "[a]ny controversy or claim arising out of or relating to" the Finder Agreement. (Dkt. 17, Dkt. 33, Def.'s Ex. 3.) Plaintiff contends that the failure to execute the Finder Agreement demonstrates a lack of assent necessary to form a binding contract, while Defendant argues that Plaintiff's continued performance of the agreement and failure to object to its terms demonstrates assent to the

agreement and, by extension, the arbitration provision.  The parties also dispute whether the Finder Agreement should be enforced, with Plaintiff arguing that the transaction at issue was governed by an independent oral contract and Defendant arguing that the transaction was governed by the Finder Agreement.  However, the sole issue presently before the Court is whether an enforceable agreement to arbitrate exists based on the facts and evidence.  Considering the facts and evidence presented, the Court finds that the agreement to arbitrate included in the Finder Agreement is enforceable and binding on the parties due to their assent and conduct, as discussed below.

The question of whether a valid agreement to arbitrate exists is a question of contract formation.  *Glob. Travel Mktg., Inc. v. Shea*, 908 So. 2d 392, 398 (Fla. 2005).  To prove the existence of a contract under Florida law, the party seeking to enforce the contract must prove the following elements: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms.  *Kolodziej v. Mason*, 774 F.3d 736, 740–41 (11th Cir. 2014) (citing *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004)).  Here, the parties dispute the element of acceptance, disagreeing as to whether the parties assented to arbitration.

To establish the formation of a contract under Florida law, courts do not consider the subjective intentions of the parties.  *HTC Leleu Family Tr. v. Piper Aircraft, Inc.*, 571 F. App'x 772, 776 (11th Cir. 2014).  Rather, "the test of the true interpretation of an offer or acceptance is not what the party making it thought it meant or intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."  *Jackson v. Inv. Corp. of Palm Beach*, 585 So. 2d 949, 950 (Fla. 4th DCA 1991) (quoting 1 *Williston on Contracts* § 94 (3d ed. 1957)).

Mutual assent is a prerequisite for the formation of any contract and is evaluated by analyzing the parties' agreement process in terms of offer and acceptance.  *Kolodziej*, 774 F.3d at 740–41.  Under Florida law, assent can be manifested in several ways, including by the acts,

conduct, words, or performance of the party.  *Fi-Evergreen Woods, LLC v. Robinson*, 135 So. 3d 331, 336 (Fla. 5th DCA 2013); *Consol. Res. Healthcare Fund I, Ltd. v. Fenelus*, 853 So. 2d 500 (Fla. 4th DCA 2003).

The parties dispute whether an arbitration agreement is enforceable absent a party's signature, as neither party signed the Finder Agreement containing the arbitration provision. Plaintiff argues that the Finder Agreement containing the arbitration provision is only valid upon execution, as the agreement states that "when executed by FINDER [the agreement] will constitute a valid and binding agreement."  (Def.'s Ex. 3.)  Under Florida law, the acceptance of an offer, to result in a contract, must be in the mode, at the place, and within the time expressly or impliedly required by the offer.  *Kendel v. Pontious*, 261 So. 2d 167, 169 (Fla. 1972).  However, "a valid contract is formed, notwithstanding a deviation from the offeror's designated mode of acceptance, if there was a meeting of the minds and the offer was indeed accepted."  *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1270–71 (11th Cir. 2015).  Therefore, the fact that the Finder Agreement specifies a method of acceptance is not dispositive of whether Plaintiff accepted the arbitration agreement.

Moreover, while the FAA requires that the arbitration agreement be in writing, it does not require that it be signed by the parties.  9 U.S.C. § 2; *Caley*, 428 F.3d at 1368.  Similarly, under Florida law, a contract may be binding on a party despite the absence of a party's signature. *Gateway Cable T.V., Inc. v. Vikoa Constr. Corp.*, 253 So. 2d 461, 463 (Fla. 1st DCA 1971).  The lack of a signature is not fatal to the enforceability of the arbitration agreement at issue.  Because the object of a signature is to show mutuality or assent, a contract may be binding on a party notwithstanding the absence of a signature if the parties assented to the contract in another manner. *Id.*

The parties may be bound by the provisions of the Finder Agreement if the evidence supports that they acted as if the provisions of the contract were in force—for example, by performance. *Sosa v. Shearform Mfg.*, 784 So. 2d 609, 610 (Fla. 5th DCA 2001); *see also Wiand v. Schneiderman*, 778 F.3d 917, 924 (11th Cir. 2015) (stating that a party may be bound by a contract where both parties performed under its terms); *Mays v. Keiser Sch., Inc.*, No. 10-61921-CIV, 2011 WL 1539675, at *2 (S.D. Fla. Mar. 31, 2011) (citing *Sierra v. Isdell*, No. 6:09-cv-124–Orl–19KRS, 2009 WL 2179127 (M.D. Fla. July 21, 2009) (finding that a plaintiff's course of conduct of continuing her employment with the defendant, with knowledge of the terms of the agreement, including the arbitration clause, constituted assent to those terms)); *Turton v. Singer Asset Fin. Co.*, 120 So. 3d 635, 639 (Fla. 4th DCA 2013) (finding that a party's continued performance of her job was acceptance of the agreement); *L & H Constr. Co. v. Circle Redmont, Inc.*, 55 So. 3d 630, 634 (Fla. 5th DCA 2011) (finding that although the party did not sign the agreement, it clearly accepted it by its actions); *BDO Seidman, LLP v. Bee*, 970 So. 2d 869, 875 (Fla. 4th DCA 2007) (finding that a party evinced acquiescence to terms of the agreement by continuing employment after the agreement came into existence); *Sec. Mgmt. Corp. v. Hartford Fire Ins. Co.*, 641 So. 2d 184, 186 (Fla. 3d DCA 1994) (finding that a party accepted agreement by failing to object to its terms and continuing to perform under the agreement); *James Register Constr. Co. v. Bobby Hancock Acoustics, Inc.*, 535 So. 2d 339, 340 (Fla. 1st DCA 1988) (finding acceptance where the parties acted as if the provisions of the contract were in force).

Here, Plaintiff manifested assent to arbitration, as the evidence supports that Plaintiff acted as if the provisions of the contract were in force. *See Sosa*, 784 So. 2d at 610. Specifically, after his initial conversation with Ms. Davies, Mr. Trottier expressed to Ms. Davies that he looked forward to receiving the Finder Agreement. (Def.'s Ex. 2.) Following this, Mr. Trottier received

and reviewed the Finder Agreement.  Mr. Trottier then proceeded with the transaction, without objection or delay, by facilitating discussions between Defendant and ABC, arranging meetings between Defendant and ABC, identifying other potential add-on companies for Defendant, and following up with Ms. Davies on a regular basis to consummate a transaction between Defendant and ABC.  Mr. Trottier neither objected to the arbitration provision after having received it nor halted or delayed performance pending further discussion or modification of the arbitration provision.  Mr. Trottier never told Ms. Davies he could not agree to any term included in the Finder Agreement and never mentioned any concerns with the agreement whatsoever.  When viewed objectively, the Court finds that Plaintiff's continued performance after receipt of the Finder Agreement demonstrates assent to the arbitration provision in the agreement.  *See Santos v. Gen. Dynamics Aviation Servs. Corp.*, 984 So. 2d 658, 661 (Fla. 4th DCA 2008) (finding that plaintiff's continued employment after receipt of agreement containing an arbitration provision sufficiently demonstrated plaintiff's assent to the terms of the arbitration agreement).

Having observed Mr. Trottier's demeanor and considering his version of events during the evidentiary hearing, the Court finds that Mr. Trottier's testimony was unpersuasive and not entirely credible.  In contrast, the Court finds Ms. Davies more credible, as she was forthcoming and able to clearly recall and articulate the substance of her conversations with Mr. Trottier, as well as Defendant's standard practices in transactions of this nature.  For example, Mr. Trottier repeatedly answered that he did not recall a conversation that he admitted occurred eight months ago, yet he clearly remembered a ten-minute phone call that had occurred three years ago.  Specifically, Mr. Trottier testified that he did not recall a conversation with Ms. Davies in March 2014 regarding an extension of the terms of the Finder Agreement.  Conversely, Ms. Davies testified that upon informing Mr. Trottier that Defendant's fee obligation had ended pursuant to the tail provision in

the Finder Agreement, which had entitled Plaintiff to compensation for transactions consummated within twenty-four months of the identification of the add-on company, Mr. Trottier became emotional and asked to extend the tail provision.  She then testified that she informed Mr. Trottier that Defendant did not typically extend tail provisions and arranged a follow-up call with Mr. Trottier after confirming that Defendant would not extend the tail provision.  The initial phone call and ensuing follow-up call is evidenced by an e-mail from Ms. Davies to Mr. Trottier dated March 3, 2014.  (Def.'s Ex. 6.)

During his examination, Mr. Trottier denied the substance of the March 2014 call but did not credibly substantiate his denial, simply stating "I don't recall that call."  Although Mr. Trottier testified that he did not recall asking Ms. Davies to extend the tail provision of the agreement, the Court finds Ms. Davies' testimony to the contrary more credible and is convinced that Mr. Trottier did indeed confirm the validity of the Finder Agreement by seeking to extend the term of the agreement.

Similarly, rather than offer some evidence that Mr. Trottier attempted to reject or modify the arbitration provision after reviewing it, Mr. Trottier merely reiterated his position that the parties entered into an oral agreement during the February, 23, 2012, phone call.  Indeed, Mr. Trottier did not deny his continued involvement in the transaction at any point after receiving the Finder Agreement despite his assertion that the agreement was as "an obvious draft."

The Court notes that the parties involved in the transaction at issue are sophisticated and established businesses that engage in substantial, valuable transactions on a regular basis.  Indeed, the parties claimed that the transaction at issue was worth an estimated $50 million, $600,000 of which constituted the finder's fee.  It defies credulity, as Mr. Trottier testified, that the entirety of the agreement for a transaction of this magnitude was consummated in a ten-minute phone call

between two company representatives who had no prior course of dealings.  It is even more unreasonable to believe, as Mr. Trottier testified, that he had objections to the agreement and neglected to raise such objections—instead relying on the ten-minute phone call to govern the transaction—yet continued to facilitate a transaction between Defendant and ABC and communicate with Ms. Davies regarding the transaction over a two-year period.  Based on the testimony, evidence, and arguments presented at the evidentiary hearing, the Court finds that Plaintiff assented to the arbitration provision in the Finder Agreement.

Having found that a valid agreement to arbitrate exists between the parties, the Court now considers whether Plaintiff's claims are within the scope of the arbitration provision.  Here, the Finder Agreement provides that "[a]ny controversy or claim arising out of or relating to this Agreement shall be settled by arbitration."  (Def.'s Ex. 3.)  Generally, a clause referring to "any difference or dispute arising hereunder," or similar language to that effect, evidences a broad arbitration clause.  *Gregory v. Electro-Mech. Corp.*, 83 F.3d 382, 386 (11th Cir. 1996).  The arbitration provision in the Finder Agreement falls squarely within this classification.  As this case involves a dispute regarding Plaintiff's entitlement to a finder's fee for identifying a company ultimately acquired by Defendant, the dispute at issue relates to the Finder Agreement, which specifically addresses the compensation at issue in this litigation.  As such, the Court finds that Plaintiff's claims are within the purview of the arbitration clause.  Finding no legal constraints to foreclose arbitration, the Court recommends that arbitration is appropriate.  Once the court is satisfied that the parties actually agreed to arbitrate the dispute, it is for the arbitrator to decide whether the contract containing the valid agreement to arbitrate is itself enforceable.  *John B. Goodman Ltd. P'ship v. THF Constr., Inc.*, 321 F.3d 1094, 1098 (11th Cir. 2003).  Accordingly, it is

**RECOMMENDED**:

1. Defendant's Motion to Compel Arbitration be **GRANTED**, and Defendant's Alternative Motion to Dismiss be **DENIED** as moot.

2. This proceeding be stayed pending arbitration.

**IT IS SO REPORTED** in Tampa, Florida on January 8, 2016.


_____
JULIE S. SNEED
UNITED STATES MAGISTRATE JUDGE


<u>**NOTICE TO PARTIES**</u>

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.   A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   *See* 11th Cir. R. 3-1.


Copies furnished to:
The Honorable Steven D. Merryday
Counsel of Record